All right, Mr. Tini, you're up again first. Thank you, Judge Gregory, and may it please the Court, I'm here on behalf of the petitioners in the Virginia 401 certification challenge, which presents very similar legal questions to those in the North Carolina case, but with some nuance, so I'd like to kind of dive into that and maybe even picking up on the last question that we got to, which was the question of interpretation. Because Virginia, like North Carolina, is saying, no, it doesn't matter that we didn't specifically require compliance with erosion and sediment control, even though we included that as a condition in the last 401 certification we issued, because we incorporated it by reference by binding them to construct the project as described. And North Carolina just did something, at least that case, that kind of took it a step further. They basically admitted that's what they did. Everything you say it should be done, they said, yes, we agree, that's what we're bound to be bound by. It sounds like to me they satisfied just what you want. I mean, they did it on a court of law right here in front of us and said it as plainly as it could be. I don't know how much plainer you could get to be it other than, you know, if you can't trust the fact that they say it to us and then we'll come back to this court again on the merits of it, it seemed to be pretty straightforward on that point. The issue here is unique in that we are considering representations in court about what a contract means before it's trying to be enforced. And so there is this strange two bites at the apple and, you know, there has to be a choice about, you know, which case to win or lose in some ways, you know. And in the abstract where you have that, I got it. But when you have parties on the other side that come into court and says everything that you say you think that contract have done, they said, yes, it does, and we are bound by it. I don't get it. It sounds like to me you have what you want on that. I think the issue is that Congress has preempted these laws, and I don't know that they can have an agreement to undo that which Congress has preempted in the Natural Gas Act. And the reason, quite frankly, that my clients are so concerned about this is that this company, Mountain Valley Pipeline, has twice sought relief in court from efforts to enforce state or local laws under the preemption doctrine. And in one of them, it involved the Commonwealth of Virginia's efforts to enforce a 401 certification, the case that is commonly referred to as the Paylor case that involves. You see the problem you could run into in the future if this case comes up and they don't comply with those conditions, they get up and make you a sane argument, say, yeah, we said it, but Congress has preempted us from doing it. How are you going to handle that? You're going to come back and say, well, your honor, that was what I said, even though the court feels differently. Well, yeah, I wouldn't be judicially estopped, I don't think, under the, you know, you have to prevail. If I prevail, I'm not interested in estoppel, I'm interested in how you represent something in this court right now. I'm willing to estoppel to the extent, but I mean, it would not be a kind day for that to happen in this case, particularly if you come back to the same panel. But even if you come to this court, I can't imagine it would be a kind day for parties, the same parties that come back in and take diametrically opposed positions that have been very clearly stated to us and represent in this case. I think what's happening here is an amendment to the certification by testimony in open court or representation by the parties. The enforcement action would occur either by the Army Corps of Engineers, by the state that's affected, or by a citizen suit brought by parties, not just by my clients, but perhaps others. Take, for example, Pennsylvania County. Let's say Pennsylvania County didn't feel that it was getting its fair share of taxes. Mountain Valley committed to paying it a certain amount. Pennsylvania County sues them under the citizen supervision, trying to recover that amount of money. They weren't a party to this case, so judicial estoppel by its own terms doesn't apply. The case is going to occur in a district court. The preemption defense is going to be very tempting, wouldn't it be? It's remarkable to suggest that they can agree in open court to supersede that which Congress prescribed in the natural gas act. Let me ask you one other question, just for clarification. This particular instance, there was FERC approval. As I understand, there's something being filed in the D.C. Circuit, too. Was it in this case? Because Congress sort of gave that FERC approval business to them, this is a different kind of case. So are you seeking this same kind of remedy in the D.C. Circuit, too? No, Your Honor. What is being sought in the D.C. Circuit is judicial review of the FERC certificate itself based on the standards- Which is this case. It's a Virginia case. You've got an approval here. I don't think you've got an approval yet in North Carolina, do you? We do, Your Honor. That was actually issued first in November of 2025. So you have two FERC approvals, not just one. I don't know why I thought there was only one. No, I'm sorry, Your Honor, and I don't mean to confuse. There is one FERC approval for the length of the pipeline across Virginia and North Carolina. I got that. But I'm talking about for what we are talking about now. This particular project, I don't think that length, FERC approval, is going to work just for these spurs or whatever they call them. So I'm asking about this. What has been given FERC approval, and I think only to Virginia, what has. Is that correct or not? I don't believe that to be correct, Your Honor. In December of 2025, FERC approved Mountain Valley's application to amend its Southgate project basically to create this 31-mile pipeline. And FERC granted that amendment and approved it from its origin near Chatham to its conclusion in Rockingham County. That is approved by FERC. I need to shift gears here because how is your argument not waived? Respondents argue that you failed to raise these concerns regarding the permit conditions in the notice and comment period, and so it's waived. What's your response to that? Where can I find that you raised these concerns before? I believe that we submitted the document. They were raised in written comments submitted at a public hearing that was required by statute on January 6th. What's important to understand is that Virginia has two comment periods for controversial permits. The first comment period is only on the draft permit. We commented on what was on the paper in front of us. We did not understand at that time the reasoning that Virginia was going to levy. Okay, so you're saying that in the first comment period you did not actually specifically raise these issues, so they would be right about that if that's all there was. That would be waiver. But you're saying that because you later brought it up in the second comment period that that's sufficient for you not to have waived the argument. Is that it? Yes, it is. The Virginia statute requires the department to publish responses to public comments and then to hold a public hearing to provide an opportunity for individuals who previously commented either at a public hearing or in writing during the applicable comment period to respond to the department's public comment summary and response. That's exactly what we did on January 6th, and that should be an exhibit to our reply. We responded to their responses to comments where they said, you know, we were lying. It is an exhibit. Why is that not too late? Because the statute expressly allows individuals such as the petitioners to comment at that hearing in writing or in orally, and that hearing was held on January 6th. The permit was not issued until later. The department had the opportunity to respond to those comments. In fact, it acknowledged that the comments had been made in one of the documents accompanying the final issuance of the permit, yet it did not correct what would appear to petitioners to be plain error. So I guess the short answer is January 6th was a timely comment under Virginia statutes, and what Virginia and Mountain Valley Pipeline have picked up on is the final sentence of that statute conceivably says, no new information shall be accepted at that time. But this is not new information. Rather, this is a response to the department's public comment summary and response, which is the first time they disclosed their reasoning, which included these conditions, and therefore that's why our comments are not new information. So the argument regarding the conditions is preserved. With my remaining time on the merits, I'd like to pivot, if there aren't any other questions about the conditions, to the other error that Virginia has committed. Virginia commits the same kind of blatant contradiction that West Virginia had predicted. In one breath, DEQ says in those documents that were released before the controversial permit hearing that it believes that water quality standards and water quality requirements will be complied with because Mountain Valley will comply with the Erosion and Sediment Control Plan. And then in the next breath, Virginia has to discount the hundreds of violations of the Erosion and Sediment Control Plan by saying that they don't think that they were significant or mattered in the ultimate course of things. But that was based on, they considered 11,000 inspection reports and nine different independent analyses of the mainline data. That was based on all of that. So how is that not a rational explanation? Because Virginia's own inspections and own civil penalty assessments are the source of how we know that Virginia was enforcing that Erosion and Sediment Control Plan. Through a $2.15 million civil penalty assessed through a consent decree during, if you think of it as phase one of Mountain Valley mainline construction. And then after the fact, after the Fiscal Responsibility Act was passed and Mountain Valley is completing its pipeline, additional violations were committed that Virginia DEQ fined them, I believe, close to $100,000. And that too is in the record. And so it's contradictory for Virginia to say in one hand, we're sure they're going to comply because they're going to have to comply with the Erosion and Sediment Control Law. And then to say, all of those violations of the Sediment Control Law that we prosecuted don't matter. It's just simply irrational. And that's the same reasoning that failed the test. So you just don't agree with their conclusion based on their consideration of the 11,000 inspection reports and nine different independent analyses. That's what it sounds like. You just don't agree. But they did have some rational, at least it seems to me like they had some rational basis in this case, in the Virginia case. The trouble is with their express statements where they said they were relying on erosion and sediment control, and yet they found violations. Yes, there were 11,000 inspections, but hundreds of them found violations that DEQ prosecuted and assessed penalties for. And maybe they didn't find a violation all 11,000 times, thank goodness. But they did find them a significant number of times. And the standard under Section 401 is not a- What they found was that there had not been any, quote, catastrophic aquatic impacts from the mainline, and that the mainline construction was, quote, protective of water quality. You just don't believe that? I don't think that's the correct standard. Catastrophic is not the standard. It's compliance- What about protective of water quality? Is that the standard? It's protection. The statute provide, or the current regulations provide that they must comply with water quality requirements, which include state laws regarding water quality. The erosion and sediment control law is one of those water quality requirements. So when Virginia says, we don't have any evidence of violations of water quality or impact, what they're ignoring is that their fact sheet says what the regulation requires, which is that they have to predict compliance with water quality requirements, which includes that erosion and sediment control permit that Mountain Valley Pipeline violated in Virginia hundreds of times. And so it's not that we just simply disagree with the conclusion. It's that the conclusion applies the wrong standard, and on its face is contradictory to itself. And the regulations that I'm speaking of here are 40 CFR section 121.3, which is what required Virginia to evaluate compliance with water quality requirements, not just water quality standards, and then 40 CFR 121.1J defines water quality requirements to include any other water quality related requirement of state or tribal law, which would include the erosion and sediment control permits that Virginia found so many violations of. I see that I'm running out of time. So unless there are further questions, which I'd be happy to address, we'd respectfully request that the court grant the stay motion. Thank you. Thank you, Mr. Taney. Ms. Kulbach, I think. Kulbach, Your Honor. Yes. Thank you.  May it please the court, Assistant Attorney General Catherine Kulbach on behalf of the Virginia Department of Environmental Quality and the other Commonwealth respondents. Petitioners failed to meet their burden of showing that the circumstances justify a stay. Most notably, they failed to make a strong showing that they are likely to succeed on the merits. And if I have the time, there are three points I would want to go over on the merits prong. Number one is that NBP's permit includes erosion and stormwater management requirements, although this issue was waived as the petitioners failed to timely raise it to the agency. The second matter would be that DEQ gave a reasoned explanation as to why mainline violations do not violate the certification. And third, the one alleged error in the Geosyntec report does not affect DEQ's reasoned explanation that Southgate will not violate water quality standards. And of course, this court reviews 401 certifications with deference to the issuing state agency. So as we review these issues, the questions to consider are whether the agency considered the relevant factors and whether a clear error of judgment was made. On the first argument. So yeah, so opposing counsel says that it was not waiver because their January 6th comment was timely because it was provided for in the statute, those comments, and that Virginia just didn't respond to it. Yes. Yes. 9 BAC 25210 172 makes clear that at the end of the public comment period, which includes that first hearing that was held, no new information will be accepted. Opposing counsel can see that. Right. And he predicted that you would say that you would say, you know, that's no new information, which is why opposing counsel explained, at least in his view, why this is not new information. Why is it not new? Why is it new information? It's new information because petitioners had access to the draft permit, which is substantively the same as the permit that was ended up being issued. So they knew the conditions that DEQ included to protect water quality. If they thought a condition was missing, if they thought stormwater and erosion needed to be in there expressly, they had ample time to make that argument. They did not. Instead, during the public comment period, they made an argument that the standards and specifications did not have enough detail to protect water quality. By making that argument, they are conceding that DEQ can enforce the standards and specifications against MVP. Then, after public comment was done, after that first hearing, at a time when the agency by law cannot accept new information, now they raise the argument that the agency is preempted from... What's the point of the second comment period then? Why even allow additional commentary? Or was that just not allowed at all, their January 6th comment? That second hearing is required under that same regulation. And this goes for...  I mean, you can't raise anything in the second hearing? I guess not new information. Exactly. It allows commenters who commented previously to respond to DEQ's comments. This comment by petitioners goes beyond a response. It raises a whole new argument of preemption that they failed to make and could have made as they had access to the draft permit during the actual public comment period. DEQ was not required to consider that information as it was made outside the public comment period time. Had they made it during the public comment, then this same regulation requires the agency to consider that information. But however, while I do believe that they waived, that point is moot as the permit includes those exact requirements that petitioners claim are missing. And just like in the North Carolina case, MVP agrees it is bound by the terms of its application. It is bound to complete erosion and stormwater requirements here. So MVP agrees the terms of the permit are clear. The permit incorporates the application. The application, in turn, requires MVP to comply with the standards and specifications and also with site-specific erosion sediment control and stormwater management plans. Counselor, tell me... You can see why... I'm sorry. No, go ahead, Judge Wendt. You can see why they would have some degree of skepticism, even if they were not the same case or the same situation, the blatancy in the West Virginia earlier case, that it really comes down, and kind of unusual, is how much can we trust you to say what you say you say? When you come in here and say it orally as opposed to putting it on paper, and it just seems like they want to have this more concretely stated. I guess that's the end result of what's going on here. But you've made those statements, and I assume you heard previously what was in the North Carolina case, and I take it the same representations are being made here on behalf of Virginia. Absolutely, and I think no matter how concretely an applicant says they'll do something, there's always the chance of a violation, and then that's why the agency has enforcement authority. Opposing counsel brought up the $2.15 million civil penalty that incurred on Mainline. And DEQ will go after MVP if they break the law, if they violate the terms of the permit. But what's at issue right now is that the terms of the permit clearly include erosion and stormwater management requirements. And so, to the extent that the concern is Mainline violations, DEQ provided a reasoned explanation for why it believes that Southgate will not violate water quality standards. And that reasoned explanation can be seen in DEQ's response to comments, that's docket number 23-9, pages 65 to 72 of the ECF watermark. And the most important point here is that DEQ found that no exceedances of Virginia water quality standards attributable to MVP Mainline were documented during or after construction, and that's on page 70. And as Judge Sacker pointed out earlier, that's based on over 11,000 inspections, as well as studies by the U.S. Geological Survey and Virginia Commonwealth University. And the reason why you can have violations, but still, we can still be confident that Southgate will protect water quality standards is in part because violations of erosion and sediment control measures do not always equate to actual violations of water quality standards. The vast majority of Mainline's violations were related to not meeting administrative requirements. You can see that on page 70, as well. So that was missing timelines, reporting requirement, it was a lot of administrative requirements. I believe only 13% of the violations included an actual sediment release. MVP learned from Mainline and made improvements to erosion stormwater management techniques. MVP Southgate is a smaller diameter pipe that is installed through less challenging, much flatter terrain over less distance. And Mainline was plagued by unusually high precipitation levels in 2018. And we do not expect to see those issues repeat. And then finally, the Southgate permit requires daily inspections, which MVP will have to reimburse the cost of. So DEQ clearly considered Mainline's violations, but gave a reasoned explanation as to why Mainline's violations do not mean that Southgate will violate water quality standards. And in the same response to comments, you note that construction of the MVP Mainline has been the most regulated, inspected and monitored linear utility construction project in Virginia, recent history and perhaps ever, that's on page 67. And then the 3rd point that I wanted to make for the geosyntect report. The only allegation is that that report used the wrong West Virginia impairment threshold. And that this then affected the characterization of 1 of the streams evaluated in that report. This argument has no effect on determination that Southgate's permit will not violate water quality standards. First, the geosyntect report is described by DEQ in its response to comments as supplemental data reviewed by the agency. That's on page 62. And that's compared to the USGS and VCU studies, which DEQ referred to as critical studies. 2nd, DEQ did not rely on the impairment threshold in the report. Virginia has its own stream conditions index. DEQ reviewed that supplemental data from geosyntect as a comparison of pre and post construction conditions, not as an indicator of impairment or non impairment. In its review of the relevant portion of the geosyntect report, DEQ found that 3 of the streams actually improved in quality. 4 had only a very minor decrease, and only 1, Teals Creek, had a notable decrease. DEQ examined that data point and noted that the report did not evaluate whether mainline was the cause of that decrease. And also that data was taken within 6 months of construction, which is still within the time period when we expect to see stream health continue to improve. Further, Teals Creek is impaired by Virginia standards. But it has been impaired since 2002, long before mainline began construction. And you can see that in DEQ's 2024 integrated reports, hyperlink to which is provided in DEQ's response to comments. On page 62, and then a very important piece to note here as well. In its response to comments, DEQ notes that no area downstream of mainline became impaired since construction of mainline began. And that's in response to comments page 62. And again, that goes with the point we were discussing about the violations. DEQ has found no significant impact to water quality standards attributable to mainline. You can see that in DEQ's response on page 40 and on page 67. Again, this is based on more than 11,000 inspections. The critical USGS and VCU studies, DEQ has found that even mainline, a much larger. Project over much rockier, more mountainous terrain had no significant impacts to water quality standards. If you address these issues and it's reasoned explanation. And because petitioners have not shown a strong likelihood to succeed on the merits, I respectfully request that this court denied the motion for stay. Thank you. All right. Thank you. Council team. I'm sorry. Mr. Marwell. Thank you, Your Honor. May it please the court. Jeremy Marwell here on behalf of respondent interveners, including Mountain Valley Pipeline. I'd like to start and focus on the enforceable condition point. Given the discussion between the court and the other council, we again agree with the Commonwealth about the interpretation of condition. A4 shall conduct authorized activities as described in the joint permit application. That includes our standards and specifications and the enforceable erosion and sediment control plans. This is consistent with it's not an unusual thing. This is a four condition is part of the Commonwealth's or the department's template for one on its website. It makes sense. It's EPA guidance cited in our briefs explains why it would make sense to do this. The conditions that an agency needs to impose sort of depend on what somebody is proposing in this way. They set the baseline with what we're proposing. So to the extent that is our position, hopefully that is clear both in writing and for the court on the adequacy of the agency's explanation. Happy to take any questions. I guess I would just say the agency came at this every which way one can imagine, looking at a vast body of data that was gathered both by regulators and by Mountain Valley Pipeline. As I said, we took the mainline experience very seriously. We are looking not to repeat it. And we took a deep dive into what the actual science and data shows about the impacts of the mainline and the agency engaged with that. If that is not a reasoned explanation, I'm not sure what would be. And we think the agency, there is no inherent inconsistency. The agency looked with open eyes at the compliance record, its own compliance record from construction in Virginia. And it explained why the specific kinds of issues that arose in the mainline both did not result in violations of water quality standards. And we're not going to disturb their judgment, their predictive judgment that we could conduct this much smaller, narrower diameter project over easier, less steep and easier terrain in a way consistent with the state's water quality standards. I would say what I said in the earlier argument with regard to the other three factors, which I know the court also needs to grapple with. The public interest we think is important because of the reasons this pipeline is being constructed, again, to serve two major utilities, to serve to meet demonstrated need. I know the court has the hard job of balancing those those sometimes imponderables. But just to address the preemption point that the other made, can a state agency in your mind avoid preemption laws by just incorporating them by reference? Yes, so the Natural Gas Act, and I think this is all consistent with what this court said in West Virginia, the West Virginia DEP case, the Natural Gas Act explicitly saves from preemption the authorities of states under the Clean Water Act, the Clean Air Act, and the Coastal Zone Management Act. And so I think the law is clear that when the state is acting pursuant to its Clean Water Act authority, that is not preempted. I mean, to be honest, that's why we're here. If a municipality had a zoning law that said, you know, we don't want a pipeline in our town, that is the kind of thing that we think would likely be preempted. You'll see cases on that. But here the state is acting pursuant to its Clean Water Act authority, and that's what I take the court to have said about preemption. And so the point is that the 401 certification is enforceable, and we think these obligations flow from Condition A-4 of the certification. Thank you. On the balancing of equities, there are several cases in our briefs, Sierra Club versus Army Corps, one from the Western District of Texas and one from the DDC, where then Judge Jackson, now Justice Jackson, grappled with how do you balance things like irreparable harm against need for a pipeline. Those are both pipeline cases. We thought that analysis was persuasive to the extent that is useful to the court instructed. We would refer you to that. If there are no further questions, we would urge the court to deny the motion for stay. Thank you, Mr. Mower. Thank you, counsel. Mr. Tini. Thank you, Judge Gregory. A few points in rebuttal. First, on the question of the condition incorporation, Mr. Marwell relies on an EPA guidance that they cited in their brief. That guidance is from 2010, and it was expressly rescinded by the EPA in 2019. And since that time, the regulations have made clear that if something is necessary, well, made clear that the statute means what it says, that if something is necessary for compliance with water quality standards, it should appear as a condition in the permit rather than in the description of the project, which is really, again, all that is doing is describing which streams, where, and what crossing method, not what environmental compliance measures will be used. On the question of waiver on the condition argument, counsel for the Commonwealth has cited the regulation. I'd also direct the court to the statute, the Virginia Administrative Code 10.1-1184.1. The Commonwealth, once again, takes the position that what we offered was new information, but it was directly responsive to statements made in the summary and response to comments. So it is squarely within the language of the statute and the regulation as permissible comments. On the question of compliance with water quality standards, I think we need to listen carefully to what the counsel for the Commonwealth is saying and what they wrote in their brief and what DEQ said. That they are saying, first of all, there were no significant effects on water quality standards. And that sounds a lot like what this court rejected in the West Virginia case, where West Virginia was insisting that there were no significant effects on water quality standards in that case. They described them as minor. They relied on language about significant adverse changes. But this court held that no water quality standards violations are permissible. And then also listen carefully to what they are saying. It's an admission that they're applying the wrong standard. Because time and again, they point to water quality standards, ignoring that the regulation requires them to assure compliance with all water quality requirements. Which is not limited to just standards, but also includes those erosion and sediment control violations that the agency admits have occurred. Finally, on the question of whether or not the geosyntech issue was... First, it was a clear error. The agency was made aware that the impairment threshold under the metric that they were evaluating was far higher than what MVP had told them it was. They did not respond to that. They did not engage with or grapple with that contrary evidence. They did not explain that, well, this is a Virginia standard. This is a Virginia stream, not West Virginia. None of that is in their explanation. They just acknowledged the comment was made and went on their merry way. And you cannot decipher what are the independent grounds on which Virginia has made this conclusion. They keep citing nine different studies and suggest that somehow we have to run the gauntlet of showing that each and every one of them was defective. That inverts the standard on its head. As the Supreme Court held... So now they've said too much in their explanation. I mean, in the case before, you were arguing that they didn't say enough. And so that wasn't a sufficiently rational explanation. And now it sounds like you're saying they provided too much information so we can't grapple with it. That you can't grapple with it. I don't think that's exactly what we're saying. What we're saying is if the agency truly believed, for example, that the USGS data was independently sufficient, it could have and should have said that. And that's what the Supreme Court requires. And in the case that Mountain Valley cited, food and drug administration versus wages versus wages and white lion investments, that's at 604 U.S. at 590 to 91. There they explain that although a remand isn't necessary every time an agency makes a mistake, it is... You can only avoid it if it's absolutely clear that they would have... That it had no bearing on the decision they made. I see that I'm out of time. I thank the court for having these special arguments remotely. And respectfully request that the court grant the motion for stay pending review. All right. Thank you, counsel.  All. It's again, we can't come down and shake your hands, but know that we appreciate your arguments here today. And thank you very much. With that, I ask that you would adjourn the court. I suppose of Senate aye. Dishonorable court stands adjourned. Senate aye. God save the United States and this honorable court.
judges: Roger L. Gregory, James Andrew Wynn, Stephanie D. Thacker